UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**VICTOR AINA**,                                            Case No. 6:15-cv-00746-KI

                Plaintiff,                        OPINION AND ORDER

   v.

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security**,

           Defendant.


     Alan Stuart Graf, P.C.
     208 Pine St.
     Floyd, VA 24091

          Attorney for Plaintiff

     Billy J. Williams
     United States Attorney
     District of Oregon


Page 1 - OPINION AND ORDER

Janice E. Hebert
Assistant United States Attorney
1000 SW Third Ave., Ste. 600
Portland, OR 97204-2902

Alexis L. Toma
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

       Attorneys for Defendant

KING, Judge:

Plaintiff Victor Aina brings this action pursuant to section 205(g) of the Social Security

Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying plaintiff's application for supplemental security income benefits ("SSI").

I affirm the decision of the Commissioner.

## BACKGROUND

Aina filed an application for SSI on June 16, 2011, alleging an amended disability onset

date of December 2, 2011.[1]  The application was denied initially and upon reconsideration.  After

a timely request for a hearing, Aina, represented by counsel, appeared and testified before an

Administrative Law Judge ("ALJ") on August 27, 2013.

On September 26, 2013, the ALJ issued a decision finding Aina not disabled within the

meaning of the Act and therefore not entitled to benefits.  This decision became the final decision

---

[1]Aina also filed an application for DIB, but when he amended his disability onset date he
no longer qualified for DIB.

PAGE 2 - OPINION AND ORDER

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on

February 27, 2015.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits

to people who have contributed to the Social Security program and who suffer from a physical or

mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security

income benefits may be available to individuals who are age 65 or over, blind, or disabled, but

who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to

cause death or to last for a continuous period of at least twelve months.  42 U.S.C.

§§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his

physical or mental impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for

determining if a person is eligible for either DIB or SSI due to disability.  The evaluation is

carried out by the ALJ.  The claimant has the burden of proof on the first four steps.  *Parra v.*

*Astrue*, 481 F.3d 742, 746 (9ᵗʰ Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920.  First, the ALJ

determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R.

§§ 404.1520(b) and 416.920(b).  If the claimant is engaged in such activity, disability benefits are denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  *Parra*, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

PAGE 4 - OPINION AND ORDER

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9ᵗʰ Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. *Id.* (internal quotation omitted).  The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

According to the ALJ, Aina has the following severe impairments:  obesity, degenerative joint disease of the knee, chronic obstructive pulmonary disease, anxiety/post-traumatic stress disorder, depression, and personality disorder.  The ALJ found these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  Given these impairments, the ALJ concluded Aina could perform sedentary work, except he could only occasionally stoop, crouch, climb, kneel, crawl or balance.  He would need to avoid concentrated exposure to fumes, dust, gases, poor ventilation, and other noxious odors.  Importantly, he would be limited to simple, repetitive tasks requiring no more than occasional interaction with supervisors, co-workers, and the general public.  Based on this residual functional capacity ("RFC"), Aina could not perform his past work as a packer supervisor.  However, he could perform other work in the national economy, such as packager sealer, final assembler, and addresser.  As a result, Aina was not disabled under the terms of the Act.

## FACTS

Aina was 36 years old on his amended alleged onset date of disability, with a high school

degree.  He does not challenge the ALJ's assessment of his physical impairments, only the ALJ's

analysis regarding his mental impairments.  As a result, I summarize only the relevant medical

record here.

Wayne Taubenfeld, PhD, examined Aina at the agency's request in April 2011.  Aina had

not had any mental health treatment prior to seeing Dr. Taubenfeld for assessment.  Aina was

born in Hawaii.  As a seven-year-old, he saw his father die of a brain aneurism and both his

mother and her new partner were emotionally and physically abusive toward him.  He reported

losing his first son, who was two years old, to pneumonia when Aina was only sixteen years old.

Tr. 242; *see also* Tr. 312 (Aina reported being seventeen years old when his first son died), Tr.

424 (first son died in toddler-hood).  A second, seven-year-old son died of leukemia.

Aina last worked in 2009, but the job ended when the company closed.  At the time of the

evaluation, Aina was living with his wife, his 11-year-old son, and his father-in-law.  Aina's long

and short-term memory was intact, his thought content was appropriate, and his insight and

judgment were intact, but he tested in the "much above average" range for depression and

anxiety.  Dr. Taubenfeld described Aina's mood as "predominantly depressed with periodic

anger when discussing specific issues."  Tr. 243.  Dr. Taubenfeld diagnosed Aina with biopolar

disorder II, depressed, moderate; generalized anxiety disorder; and posttraumatic stress disorder,

in remission.  He also diagnosed personality disorder NOS (depressive).  The doctor noted

Aina's social interactions tended to be cooperative and warm, but he could have mood swings,

sudden anger and irritability, and anxiety and multiple personality traits.  He thought Aina's

anger could be treated.  The doctor thought Aina "may have difficulties coping with emotional demands and stress of work," "has limited work tolerance and may have problems with supervision," and "has limited stamina or work tolerance due to pain fatigue."  Tr. 249. Additionally, the doctor noted interpersonal barriers in that Aina "may be unable to effectively resolve conflicts with co-workers" and "may be unable to understand/demonstrate interaction or behavior appropriate to worksite."  Tr. 252.

Aina began attending therapy sessions with Abby Tuttle-Shamblin, QMHP, in June 2011, who diagnosed adjustment disorder with mixed disturbance of emotions and conduct.  Aina sought help with anger management, reporting punching inanimate objects to deal with this fury. Aina sought help reducing his angry blowouts from six days a week to once a month or less, and he sought help finding housing he could afford without his father-in-law's financial assistance. Tuttle-Shamblin provided coping strategies, interventions, parenting advice, and anger management techniques.

Over the course of the three years she treated Aina, Tuttle-Shamblin learned about a few angry episodes.  In July 2011, she was required to report to DHS Aina's violent episode with his father-in-law (slamming him against the wall) because Aina's son had been present.  She encouraged Aina to report the incident to the agency first, which it appears he did.  After this incident, Aina sought assistance moving himself and his family out of the house they were sharing with his father-in-law.  The family lived in a series of temporary shelter placements which was stressful.  In the meantime, Jessica Mason, QMHA, encouraged him to fill out job applications and assisted him in locating more permanent housing.  Tuttle-Shamblin offered coping mechanisms to both Aina and his wife.  In September 2011, however, Aina reported

feeling ongoing stress about their living and financial situation. He reported that he had an "episode" on the bus when he yelled "shut up" at loud children. He took responsibility and apologized to the parents. Tr. 329.

In October 2011, Aina's wife was approved for disability. A few weeks later, they were provided private housing.

Laura Tamkin, QMHP, interviewed Aina at the beginning of November 2011 and diagnosed him with adjustment disorder with mixed disorder of emotions and conduct, and post-traumatic stress disorder. She found him to be cooperative, with an unremarkable appearance, coherent, logical, phobic, anxious, angry and depressed. His insight and judgment were good. His anxiety was at a severity level of 8 or 9 and he felt emotionally overwhelmed, and his depression was at a severity level of 7 or 8. All of these symptoms affected his social interactions. She thought his biggest mental health challenge was coping with his anger and his feeling of being overwhelmed; he worried about losing his temper. His prognosis was fair to good, with adequate supports.

Aina and his wife started attending couples therapy with an intern named Nicole. At one of these sessions, when talking about the prospect of his son doing drugs, Aina told Nicole a number of times that he would break both his son's legs. In response, Tamkin met with Aina and guided him to acknowledge other punishment options; Aina had been physically disciplined as a child, which is the only way he knew to discipline.

A week later, Aina told Tuttle-Shamblin that he had experienced a few "blowouts" over small things that week, but was willing to discuss ways to better handle his frustrations. Aina's wife was "scared" during one of these blowouts, although not for her safety. Tr. 343. Aina said

he was working on it.  He had no angry blowouts to report at the following session, and he shared having a positive conversation with his son.  Tr. 345.  Aina continued to do "okay" at managing his frustrations and anger over the course of the stressful holiday season.  Tr. 347.   He was connecting with his family over Facebook.

Aina became involved in the monthly community meetings at the Family Housing Program, appearing active, friendly, and talkative.  Tr. 407.  In late January 2012, Aina reported feeling like things were going well for him; he was able to listen to his mother-in-law's opinions without getting angry.  Tr. 353.  In February 2012, however, Aina said he had yelled at his wife and pushed over an end table when he felt she had been ignoring him.  Tr. 405.  He had been having a hard time sleeping.  Two weeks later, Aina's wife said Aina had only been angry when talking with his ex-wife on the telephone.

Aina continued to do well, using different parenting techniques when his son swore at him, and managing the difficulties of being short on money and food at the end of the month.  In May 2012, Aina described a time when he was able to interrupt his anger pattern and communicate with his wife.  Tr. 390.  He started using a CPAP machine to help him sleep and he was feeling well.  He was again able to interrupt his anger at the end of May 2012.  He was relaxed and sociable at a community meeting.  In June 2012, Aina told Tuttle-Shamblin that he had fewer blowouts a week; he had four a week at the most and sometimes had as few as two. He thought his coping skills had improved.  He was actively looking for employment and had investigated temporary work with Harry and David starting in November, but he was hoping for something more permanent.  Tr. 471.  Aina requested ideas from Family Housing Program staff to deal with the noisy neighbor children.  Tr. 380.  In mid-July 2012, Aina attended a meet-and-

PAGE 9 - OPINION AND ORDER

greet to interview candidates for a position at the Family Housing Program; he asked a number of questions and gave his opinion to the hiring committee.

Aina's mother died at the end of July and Tuttle-Shamblin helped him process his grief. Aina was able to participate in a community meeting in early August 2012. Aina continued to grieve through the remainder of 2012, having trouble sleeping, feeling overwhelming emotions, and taking his frustrations out on his son and wife. In September, he described feeling anxious while riding a bus. He started taking medication to help him manage his anger. This may have been suggested by Tamkin, who reported that Aina expressed fear of losing his temper and punching walls; apparently, he had had a screaming episode on a city bus in August and was removed. Tr. 463.

In January 2013, he was coping with his anger by talking with friends. He thought he experienced angry blowouts three times a week. Tr. 495. In April 2013, he described feeling frustrated with his wife about her inability to listen; he got angry with her when she brought him the wrong food. Tr. 501. Tuttle-Shamblin helped him complete a letter about why Aina felt he was not ready for employment through the JOBS program; he expressed grief about his mother's death. Tr. 507. In the letter, Tuttle-Shamblin wrote "to suggest that Victor will need to make further progress on his treatment goals before he is in a place to find and hold consistent employment through the JOBS program." Tr. 440. She indicated Aina experienced "serious and sometimes out of control anger on almost a daily basis[.]" *Id.*

The next day, Aina called Tuttle-Shamblin for advice about dealing with something his son had done; Aina was "vibrating" in his chair he was so mad. He decided to wait to talk with

PAGE 10 - OPINION AND ORDER

his son until he had calmed down.  Two weeks later, he reported having one blow up that week.

He was feeling calmer in May 2013.

  In July 2013, Aina reported wanting to work from having blow ups once a week to once

every two weeks or less.  Tr. 517.  He was no longer looking for work.  He had not been violent

with anyone in the past year.  He called himself a recluse.  He was snapping in August 2013, but

had not had any blow ups.  Tr. 525.

**DISCUSSION**

  Aina challenges the ALJ's treatment of his testimony, as well as the ALJ's analysis of the

medical evidence.

I. <u>Aina's Credibility</u>

  Aina testified he had trouble managing his anger and anxiety, and that he felt depressed

after his mother died.  He had filed applications to work and had been interviewed once, but no

one had hired him.  He talked mostly about his diabetes, his knee pain, and his lower back pain

as the reasons for his inability to work.  He attended parent/teacher conferences for his son.  His

wife took care of cooking and the household chores, but he helped with the vacuuming.  He and

his wife took care of the shopping.  He spent his days on the computer and watching television;

he read books at night.  He testified the last time he was angry, he broke his coffee table over the

couch.

  The ALJ found the testimony less than credible for several reasons.  First, he was able to

go shopping, could use a ride share source, socialized with another family, and connected himself

to family and friends on Facebook.  The ALJ also pointed to treatment records reflecting his

stress was related to housing and financial difficulties, and that his symptoms did not worsen

over time.  Dr. Taubenfield noted some difficulties with social functioning, but that he tended to be "outgoing and receptive to other persons."  Tr. 19.  The ALJ's RFC limited Aina to "simple, repetitive tasks requiring no more than occasional interaction with supervisors, co-workers, and the general public."  Tr. 16.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms.  *Id.*  The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony."  *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001).  General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence.  *Id.*  "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

Aina disputes the ALJ's evaluation of the evidence, arguing that Facebook interactions cannot be compared with interactions in a job setting, and that Aina's inconsistent and explosive

anger would result in termination of employment.  Aina also pointed out the ability to undertake some activities some of the time does not suggest the ability to sustain employment.

Here, Aina's daily activities suggest an ability to sustain work activity despite his struggle to control his anger.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (daily activities a credibility factor).  Daily activities could be relevant for one of two purposes.  A claimant's daily activities might be so substantial such that they equate to an ability to work.  *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).  Alternatively, the activities might be inconsistent with testimony purporting to be limited in some way.  *Id.*  The ALJ pointed to not just Aina's Facebook activity, but also his ability to shop, attend parent/teacher conferences, and assist around the house.[2]

Further, although the ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence, medical evidence is still a relevant factor in determining the severity of the pain and its disabling effects.  *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).  Aina argues the ALJ selectively summarized the medical record, leaving out several of Dr. Taubenfeld's findings–such as his elevated depression and anxiety scores–as well as Tamkin's severe anxiety finding.  On the whole, however, as I have summarized above, Aina's condition improved over time, to the point where he could interrupt his anger pattern or ask for help in resolving conflicts.  Thus, the ALJ's reading of the record was rational.  *Molina*, 674 F.3d at 1110 (court must uphold the ALJ's findings if they "are supported by inferences

---

[2] If I were to reverse and remand for further findings, the ALJ could point to other evidence in the record supporting his conclusion.  Aina successfully participated in a number of community meetings, stopped work because the company went out of business, continued to apply for work during the relevant period, and enjoyed his counseling sessions.

PAGE 13 - OPINION AND ORDER

reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations).

The ALJ's clear and convincing reasons are supported by substantial evidence in the record.

II.    Medical Evidence

A.    Dr. Taubenfeld

The ALJ highlighted that Dr. Taubenfeld's opinions were phrased in an ambiguous way; for example, Aina "may" have difficulty maintaining emotional stability, "may" be unable to resolve conflicts with co-workers, and "may" have difficulty behaving appropriately at the worksite.  The ALJ also thought subsequent medical records did not reflect social limitations. He pointed to a medical note (for heartburn treatment) reflecting normal mood and affect.  Tr. 254.  He also pointed to Shelter Care's initial mental health assessment from November 2011, in which Tamkin reflected Aina's appearance as unremarkable, cooperative, and coherent.  Tr. 426. In summarizing Dr. Taubenfeld's opinion, the ALJ explained Aina had started therapy for anger management and that notes demonstrated his stress related to housing and finances.  The ALJ pointed out that subsequent treatment notes do not "document significant worsening of symptoms."  Tr. 18.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  *Orn*, 495 F.3d at  632.  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear

and convincing reasons. *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark*, 454 F.3d at 1066 n.2.

Aina is correct to point out the ALJ's failure to discuss any of Aina's troubling outbursts–with his father-in-law (July 2011), on the bus (September 2011, August 2012), and with Aina's wife (November 2011, February 2012, April 2013). These incidents tend to support Dr. Taubenfeld's opinion that Aina may have difficulty maintaining emotional stability. However, substantial evidence supports the ALJ's finding that Aina's treatment notes do not reflect worsening of his symptoms. To the contrary, the number of angry outbursts fell from six a week to once a week or less over the course of his two years in therapy. Further, the record reflects Aina's ability to cope improved as did his ability to ask for help in resolving situations. As the ALJ indicated, Dr. Taubenfeld's "work restrictions" couched in "may" terminology, like the doctor's "recommendations" in *Valentine,* do not suggest Aina is "incapable of working except" under the work restrictions. *See Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 691 (9th Cir. 2009) ("recommendations" not a diagnosis nor statement of functional capacity). Dr. Taubenfeld commented on Aina's test results as reflecting positively on his ability to form relationships. Finally, the ALJ's limitation of Aina to no more than occasional interaction with supervisors, co-workers, and the general public would account for any difficulties Aina would

PAGE 15 - OPINION AND ORDER

have with co-workers or supervisors.  In sum, the ALJ's interpretation of the evidence is "supported by inferences reasonably drawn from the record."  *Molina*, 674 F.3d at 1111.

B.    "Other" Sources

Tuttle-Shamblin and Tamkin are considered among the "other sources" listed in the Social Security regulations who are not acceptable medical sources.  *See* 20 C.F.R. § 416.913(d)(1)-(4).  The ALJ may reject the opinions of such sources by giving reasons that are "germane" to that source.  *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th Cir. 2010).  In considering the opinions of other medical sources, the ALJ should consider:  (1) how long the source has known the claimant and how frequently the source has seen the claimant; (2) whether the opinion is consistent with other evidence; (3) the degree to which the source presents relevant evidence supporting an opinion; (4) how well the source explains the opinion; and (5) whether the source has a specialty or area of expertise related to the claimant's impairments.  SSR 06-03p, 2006 WL 2329939.

1.    Tuttle-Shamblin

Tuttle-Shamblin helped Aina complete a letter in April 2013 to support Aina's request not to participate in the JOBS program.  In the letter, she wrote Aina would need to "make further progress on his treatment goals before he is in a place to find and hold consistent employment through the JOBS program."  Tr. 440.  She reported he was angry almost daily.  In July 2013, Tuttle-Shamblin completed a functional report for Aina, diagnosing major depression and post-traumatic stress disorder.  She described flat affect, low energy, fatigue, blackout risk with his hypervigilance and anxiety, and a significant risk of blow ups.  She thought he would have difficulty interacting with others.  However, when asked whether Aina could perform work

which did not require contact with the public or close coordination with supervisors or co-workers, Tuttle-Shamblin responded, "Considering the scenario you describe, I think his physical health would interfere more than mental health and I do not have a basis to comment about specifics of physical health."  Tr. 466.

The ALJ rejected Tuttle-Shamblin's opinions as contrary to the therapy notes, which described Aina as unremarkable and cooperative.  The opinions were also inconsistent with his functioning.

The ALJ gave germane reasons to reject Tuttle-Shamblin's opinions.  As the ALJ pointed out, Aina appeared cooperative and unremarkable on many occasions.  Indeed, the trajectory of his mental health moved toward improvement and Tuttle-Shamblin's own notes reflect a decrease in the number of angry outbursts over time.  Indeed, just three months before she opined that Aina was having near daily blowups, her notes reflect blowups three times a week.  By July, he was experiencing only one a week.  Additionally, with rare exception, Aina was able to engage in his daily activities without interference from his anger.  Further, in the end, the ALJ accommodated Tuttle-Shamblin's concern about Aina's ability to interact with others by including a limitation to only occasional interaction with co-workers and supervisors in the RFC. This is consistent with Tuttle-Shamblin's conclusion that, in the context of work not requiring close coordination with co-workers or supervisors, Aina's physical impairments would limit him more than his mental impairments would.  The ALJ did not err.

2.    Tamkin

Aina argues the ALJ failed to discuss Tamkin's opinion.  He points to Tamkin's mental health assessment where she commented on Aina's anxiety, at a severity of 8 or 9.

PAGE 17 - OPINION AND ORDER

As an initial matter, the ALJ cited to Tamkin's report, including her finding that Aina presented with an anxious mood and reported difficulty with anger.  To the extent Tamkin's observation that Aina's anxiety, depression, and emotional overwhelm are functional restrictions that would affect his social interactions, relationships, and employment, the ALJ's RFC limited Aina to only occasional co-worker and supervisor contact.  *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006) (ALJ's error is harmless where court can confidently conclude that different disability determination would have been made when fully crediting testimony).  Any error is harmless.

### CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards.  For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this ___24[th]___ day of August, 2016.


_/s/ Garr M. King_____
Garr M. King
United States District Judge